**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NIZAR ZAKKA | ) | |
| 2458 Wyoming Avenue, NW | ) | **JURY DEMAND** |
| Washington, DC 20008 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.: 21-2344** |
| | ) | |
| THE GOVERNMENT OF THE | ) | |
| ISLAMIC REPUBLIC OF IRAN, | ) | |
| Its Ministries, Agencies, and Instrumentalities | ) | |
| c/o Ministry of Foreign Affairs | ) | |
| Imam Khomeini Street | ) | |
| Imam Khomeini Square | ) | |
| P.O. Box 1136914811 | ) | |
| Tehran, Iran | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff Nizar Zakka complains of the actions of the Defendant, The Government of the Islamic Republic of Iran, its Ministries, Agencies, and Instrumentalities, and states in support thereof as follows:

## PARTIES

1.      Plaintiff Nizar Zakka ("Mr. Zakka") is a United States permanent resident who has lived in Washington, D.C. since 2008.  While performing a cooperative agreement awarded by the United States government and acting within the scope of his employment, Mr. Zakka was falsely imprisoned and tortured for a period of more than three years and eight months by Defendant The Government of the Islamic Republic of Iran, its Ministries, Agencies, and Instrumentalities ("Iran").

2.      Iran is a foreign sovereign that the Secretary of State of the United States designated as a state sponsor of terrorism on January 19, 1984.  *See* 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (citing 50 U.S.C. App. § 2405(j) ("The Export Administration Act of 1979"), *repealed and replaced by* 50 U.S.C. § 4813(c)(3) ("The Export Control Reform Act of 2018")).[1] Its activities as complained of herein are outside the scope of immunity provided by the Foreign Sovereign Immunities Act ("FSIA"), including 28 U.S.C. § 1605A.

## JURISDICTION

3.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1330 and 1331, and pursuant to the FSIA, 28 U.S.C. § 1605A.

4.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4).

5.      Mr. Zakka was a domicile of the District of Columbia at the time of his confinement and torture.

## STATEMENT OF FACTS

6.      Mr. Zakka was born in Beirut, Lebanon in 1966.  When he was fifteen years old, Mr. Zakka moved to the United States to avoid civil war in Lebanon.  He attended high school in Georgia, then enrolled at the University of Texas.  He graduated from the University of Texas in 1989 with degrees in Computer Science and Mathematics.  In 1991, he earned a master's degree in Computer Science from Texas State University.

7.      After earning his degrees, Mr. Zakka worked as a software consultant in Houston, Texas.  He returned to Lebanon a short time later to work for a U.S.-based semiconductor company.

---

[1] *See also State Sponsors of Terrorism*, United States Department of State, https://www.state.gov/j/ct/list/c14151.htm (last visited September 2, 2021).

8.      In 2004, Mr. Zakka helped found the Arab Information and Communications Technology Association, known by its Arabic acronym, IJMA3.  IJMA3 is an international non-profit whose work involves encouraging the development of information and communications technology infrastructure around the world, including in the Middle East, North Africa, and Asia, and promoting the use of such technology.  IJMA3's work has included developing technology-centered programs for workforce training, educational and school usage, and civic society development.  Mr. Zakka became the Secretary General of IJMA3, a position which he maintained until his imprisonment in 2015.

9.      In 2008, Mr. Zakka moved to Washington, D.C. to form a U.S. branch of IJMA3.  Mr. Zakka established IJMA3-USA, a 501(c)(3) organization, the following year, and became a U.S. permanent resident in 2012.  He served as the Executive Director of IJMA3-USA's operations until his imprisonment in 2015.  In addition to Mr. Zakka's work for IJMA3, he maintained a thriving personal consulting business, leveraging his technology background for corporate and institutional clients around the world.

10.     Mr. Zakka's work for both IJMA3 and IJMA3-USA focused on encouraging increased use of information and communications technology to the benefit of people in the Middle East.  Since their inception, IJMA3 and IJMA3-USA have been awarded numerous federal grants and sub-grants via several U.S. government agencies and contractors, such as International Relief and Development, Inc. ("IRD"), and Futures Group International, LLC ("Futures Group"), now known as Palladium.

11.     IJMA3 and Mr. Zakka performed work in Iran pursuant to various cooperative agreements awarded by the United States government (the "Iran Agreements").  As an example, one such agreement, between Futures Group and the U.S. State Department, involved the

Women's Alliance for Virtual Exchange (hereinafter, "WAVE II") and was operated under State Department agreement S-NEAAC-15-CA-1037.  Another agreement, between Futures Group and the U.S. State Department, involved the Small Grants Program to Support Independent Citizens in Iran (hereinafter, "CIVIC"), a program operated under State Department agreement S-NEAAC-15-CA-1038.[2]  The Iran Agreements all had a shared goal: to promote the use of information and communications technology in Iran to enable economic and civic society development, particularly amongst women's groups in Iran.

12.     Mr. Zakka made five trips to Iran in total.  During each of these trips, Mr. Zakka dutifully completed the work required of IJMA3 in accordance with the Iran Agreements.  He organized relevant conferences to highlight the way in which Iranian citizens could use information and communications technology to launch new businesses and engage their government.  He coordinated with Iranian organizations on the ground who could serve as effective partners for the promotion of information and communications technology use in Iran. He worked with Iranian women's organizations on how to use information and communications technology to achieve their goals.

13.     On September 14, 2015, Mr. Zakka embarked on his fifth and last trip to Iran to attend the Second International Conference and Exhibition on Women in Sustainable Development, "Entrepreneurship and Employment," in Tehran, Iran.  Mr. Zakka received an invitation to attend from Shahindokht Molaverdi, Iran's then-vice president of women and family affairs.

---

[2] The two aforementioned cooperative agreements were originally between IRD and the U.S. Agency for International Development ("USAID").  These cooperative agreements were ultimately transferred from USAID to the State Department, and IRD was replaced as the contractor by Futures Group.

14.     Mr. Zakka attended the conference in furtherance of his work under the Iran Agreements.  All of Mr. Zakka's expenses on the trip ultimately were paid for by the U.S. government, pursuant to these agreements.  He attended the conference and planned to return home to the United States shortly thereafter.

15.     On September 18, 2015, as Mr. Zakka was traveling to the airport to depart Iran, his taxi was stopped without warning.  Mr. Zakka was seized from the taxi and forced into a car waiting nearby.  He had no idea what was happening.  Weeks later, he would learn that he was transported to Evin Prison, a notoriously brutal prison in Tehran.[3]  He would remain there for nearly four years.

16.     Mr. Zakka was placed in a 2-meter by 4-meter solitary confinement cell, where he remained for most of the next 18 months.  He was given two blankets—one to use as a pillow— and forced to sleep on the floor.  A light was kept on in the cell 24 hours each day.  A small, dirty window near the ceiling was Mr. Zakka's only way of telling whether it was day or night. He was permitted to leave his cell only for 30 minutes a day to walk outside, and was forced to wear a blindfold each time.

17.     During those months, and during the entirety of his nearly four years in captivity, Mr. Zakka suffered prolonged and continuous physical abuse at the hands of the Iranian Revolutionary Guard Corps.  He was hit with books and other objects and forced to stand in stress positions in the corner of a room until he passed out.  He was beaten routinely—at one point so badly that he has now lost hearing in one of his ears.

---

[3] Jason Rezaian, "I know Iran's most notorious prison is built on abuse.  Now the world can see it, too.", *The Washington Post* (Aug. 25, 2021), https://www.washingtonpost.com/opinions/2021/08/25/iran-evin-prison-leaked-footage-jason-rezaian/ ("The release of security camera footage from inside Iran's notorious Evin Prison provides proof of what many already know to be true: that Iranian authorities routinely abuse prisoners and keep them in inhumane conditions. Among the scenes captured in the leaked videos are an inmate being beaten by multiple guards, another attempting to commit suicide and dozens of inmates being housed in a single room with bunk beds stacked three high.").

18.     His captors also used food deprivation as a means of coercion.  They would refuse to feed Mr. Zakka for several days, and then would place a single pistachio on the table in front of him.  "If you answer our questions correctly," they would say, "then you can eat."

19.     Mr. Zakka also suffered extreme and continuous psychological torture.  For the first three weeks that he was in Evin Prison, he did not know where he was or what was happening.  He learned his location only when a guard let it slip.  Iranian officials told Mr. Zakka that someone had taken his passport and traveled to Lebanon, so no one would ever know that he was being held captive in Iran.

20.     His interrogators frequently threatened to kill him.  They would tell him that they were going to hang him and would walk him to his purported execution—only to announce abruptly that they were not going to hang him that day; they made him perform this walk to his execution many times.

21.     Mr. Zakka was permitted to call his family once, after about three weeks in captivity, but officials ended the call after Mr. Zakka told his family that he was being held hostage.  He was told that he would never be permitted to speak to his family again.  After that, Mr. Zakka was not allowed to contact his family for several more months, and even then, was only allowed to speak to them for four minutes at a time.  At least two of those minutes were often spent dealing with the difficulties of making international calls from an Iranian prison.  The guards used phone access against him, cutting off any access to a phone at times as an interrogation tool.

22.     Mr. Zakka's captors tried to force him to confess to being a U.S. spy, which he denied.[4]  They accused him of having come to Iran to start a revolution.  The captors interrogated him about his work for Futures Group (Palladium) and the State Department, demanding the names of people who worked with him.  Mr. Zakka refused to provide names. His interrogators repeatedly told him that he would die in prison, offering to free him only if he confessed to his "crimes."

23.     Because Mr. Zakka did not speak Farsi, a translator was needed.  The translator used English instead of Arabic, Mr. Zakka's first language, in order to fit the Iranian agents' narrative that Mr. Zakka was an American spy.

24.     The guards pushed Mr. Zakka to record a video saying that he was in Iran on behalf of the United States in order to start a revolution.  He refused.  They also pressured him to admit to spying in writing.  They would ask him a question and provide him with a sheet of paper to write out his answer.  Each time, Mr. Zakka would simply put a scratch at the top of the paper, which infuriated his guards.

25.     Mr. Zakka was not permitted to speak with legal counsel until three months after his arrest, in December 2015.  When he finally was allowed to meet with an attorney, the conversation lasted only 20 minutes.  He was not permitted to meet with the attorney in private again for another four months, in April 2016.

26.     Mr. Zakka was held without charge or trial for nearly a year.  In August of 2016, he was convicted of cooperating with countries that are in conflict with Iran, in a brief closed-door proceeding.  The judge, who has been sanctioned by the European Union, sentenced him to

---

[4] In November 2016, Iranian Foreign Minister Mohammad Javad Zarif announced at a press conference that Mr. Zakka's imprisonment was "not a problem between Iran and Lebanon.  It is a problem between the U.S. and Iran."  *See* Iran News Round Up, Critical Threats (Nov. 8, 2016), https://www.criticalthreats.org/briefs/iran-news-round-up/iran-news-round-up-november-8-2016.

ten years' imprisonment.[5]  Mr. Zakka was also fined $4.2 million for collaborating against the state.

27.     After he was sentenced, Mr. Zakka was moved to the public jail.  He was placed in a 5-meter by 5-meter room with 23 other men.  The room was so crowded that each person only had space to himself about the size of a coffin.  The cells, which were underground, were dirty and crawling with cockroaches.  The prisoners slept on mattresses infested with bedbugs. Mr. Zakka remained there for two and a half years.  He was interrogated regularly even during his time in the public jail.

28.     Mr. Zakka filed an appeal of his conviction and sentence in October 2016.  Once again, Mr. Zakka was only permitted a short, 20-minute consultation with his attorney before the hearing.  He was informed that the court required an "investigation" into his work under the Iran Agreements and sent him back to Evin.  Mr. Zakka heard nothing about the status of the "investigation" or his appeal for nearly a year.  Ultimately, the Court informed Mr. Zakka that the investigation had rendered no evidence of any wrongdoing by Mr. Zakka.  The court of appeals confirmed Mr. Zakka's conviction and sentence nonetheless.

29.     Mr. Zakka sought desperately to assert some sort of control as he was held hostage.  In protest of his treatment, Mr. Zakka went on a hunger strike five times over the course of his imprisonment.  The longest lasted 33 days.  These hunger strikes further damaged Mr. Zakka's poor health.  He would need several minutes to stand up without falling down, and he bled easily.  It took nearly a year for him to recover from one of his hunger strikes.

---

[5] Salavati Abdolghassem presided over "show trials" in 2009, and "condemned to death two monarchists that appeared in the show trials.  He has sentenced more than a hundred political prisoners, human rights activists and demonstrators to lengthy prison sentences."  Council Regulation (EU) No. 359/2011 of 12 April 2011 (listing Judge Abdolghassem among the persons to whom "[n]o funds or economic resources shall be made available").

30.     Mr. Zakka's imprisonment caused an international uproar and Iran's actions were widely condemned.[6]  In October 2019, the United Nation's Working Group on Arbitrary Detention found Mr. Zakka's deprivation of liberty arbitrary and in contravention of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.

31.     On June 11, 2019, Mr. Zakka was abruptly removed from his cell and, bizarrely, brought to a shopping mall in downtown Tehran.  Iranian officials apologized to him and told him that he needed to pick out a carpet.  Mr. Zakka was confused, but the officials insisted upon filming him shopping for a carpet.  Afterwards, Mr. Zakka was taken to the airport, where a Lebanese official was waiting in a private plane.

32.     Mr. Zakka was brought to Lebanon, where he stayed for four days before being flown to the United States and reunited with his sons for the first time in nearly four years.

33.     Since his return to the United States, Mr. Zakka has continued to suffer physically, psychologically, and financially from his imprisonment in Iran.  His health has been permanently damaged.  He lost 90% of the hearing in one of his ears due to beatings during his imprisonment and has poor eyesight.  He has lasting digestive issues due to his many hunger strikes.  He suffers from dizzy spells.  He also continues to suffer severe post-traumatic stress disorder and other psychological damage.

34.     Mr. Zakka has lost the family he knew before his imprisonment.  His mother passed away while he was in Iran, without ever seeing her son freed.  His wife filed for divorce

---

[6] *See, e.g.*, "House Passes Lowey, Ros-Lehtinen Resolution Calling for Release of American Prisoners in Iran," (July 26, 2017), *available at* https://www.perseus-strategies.com/wp-content/uploads/2017/07/Press-Release-Namazi-HRes-317-7.26.17.pdf (U.S. House of Representatives passed House Resolution 317, which "[c]alls on the Government of the Islamic Republic of Iran to release unconditionally . . . Nizar Zakka"); Associated Press, "Lebanon calls on Iran to release citizen who is U.S. resident," Seattle Times (May 3, 2019), *available at* https://www.seattletimes.com/nation-world/nation/lebanon-calls-on-iran-to-release-citizen-who-is-us-resident/.

while he was in prison, thinking that he would never return. He has struggled to re-establish a relationship with his sons due to his extended absence and ongoing psychological damage.

35. Mr. Zakka also continues to suffer severe financial losses due to his imprisonment. In addition to losing nearly four years of income while he was imprisoned, IJMA3 has been destroyed, and he has been unable to return to work at his pre-incarceration professional capacity.

## COUNT I

### (PERSONAL INJURIES CAUSED BY TORTURE AND HOSTAGE-TAKING:  28 U.S.C. § 1605A)

36. Paragraphs 1 through 35 above are incorporated as if set forth herein.

37. Mr. Zakka was performing a contract awarded by the United States Government and acting within the scope of his employment when captured and held unlawfully by Iran. While being held, Mr. Zakka was physically and psychologically tortured as described herein.

38. Anti-terrorism provisions codified at 28 U.S.C. § 1605A(a) establish a federal right of action against Iran for committing acts of hostage-taking and torture.

39. Section 1605A provides four elements for a claim against a foreign state, all of which are met here:

   a.   That defendant be designated as a state sponsor of terrorism;

   b.   That claimant be an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment;

   c.   That the foreign country must be given reasonable opportunity to arbitrate that claim if the conduct took place on foreign soil; and

10

d.      That the personal injury is alleged to have been caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."

40.      Iran was designated a state sponsor of terrorism by the Secretary of State on January 19, 1984. *See* 49 Fed. Reg. 2836-02 (Jan. 23, 1984).

41.      Mr. Zakka was performing a contract awarded by the United States Government and acting within the scope of this contract at the time of his imprisonment and torture.  The Iran Agreements constitute a "contract awarded by the United States Government" within the meaning of the FSIA.

42.      The definition of "torture" under the FSIA, derived from Section 3 of the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), codified at 28 U.S.C. § 1350 (note), includes:

> [A]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person is committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind . . . .

43.      While Mr. Zakka was in Iran's custody and control, Iran intentionally subjected Mr. Zakka to nearly four years of pain and suffering, including physical torture, solitary confinement, sleep and sensory deprivation, mental abuse, and threats, all with the intent to obtain a false confession and coerce his cooperation.  Iran's conduct constitutes torture as defined under the FSIA.

44.     "Hostage-taking" under the FSIA, 28 U.S.C. § 1605A(h)(2), as derived

from Article 1 of the International Convention Against the Taking of Hostages, Dec. 17, 1979,

1316 U.N.T.S. 205, is defined as follows:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of the Convention.

45.     Iran detained Mr. Zakka on false espionage charges and threatened to kill, injure,

and continue to detain Mr. Zakka for nearly four years in an attempt to win money or other

concessions from the United States.  Iran's conduct was hostage-taking as defined under the

FSIA.

46.     A foreign state is held vicariously liable for the acts of its officials, employees, or

agents.  28 U.S.C. § 1605A(c)(4).

47.     Mr. Zakka continues to suffer physical and psychological harm to this day as a

result of his hostage-taking and torture by Iran.

## COUNT II

### (§ 1605A(c) CAUSE OF ACTION – ASSAULT AND BATTERY)

48.     Paragraphs 1 through 47 above are incorporated as if set forth herein.

49.     Iran committed or is responsible for numerous acts of assault and battery upon

Mr. Zakka during his confinement and torture.

50.     Under the FSIA, a foreign state stripped of its immunity "shall be liable in the

same manner and to the same extent as a private individual under like circumstances."  28 U.S.C.

§ 1606.

51.     Iran is stripped of its immunity under the FSIA because of its acts of hostage-taking and torture, and is therefore liable for torts in the same manner and to the same extent as a private individual.

52.     Iran applied force to the person of Mr. Zakka and took actions reasonably tending to create the apprehension of Mr. Zakka that it was about to apply such force to him.  Iran also intended harmful or offensive contact with Mr. Zakka without his consent.  Iran's conduct included intentionally and repeatedly threatening Mr. Zakka's life, threatening bodily injury, and physically attacking Mr. Zakka.

## COUNT III

### (§ 1605A(c) CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

53.     Paragraphs 1 through 52 above are incorporated as if set forth herein.

54.     Iran's use of solitary confinement, sleep and sensory deprivation, threats, mental abuse, and restrictions of Mr. Zakka's contact with his family was intentional, reckless, extreme, and outrageous, and caused Mr. Zakka severe emotional distress.

55.     Iran's treatment of Mr. Zakka violated acceptable norms of treatment under both U.S. and international law and was also for that reason extreme and outrageous.

56.     Iran's actions have left Mr. Zakka severely emotionally and psychologically damaged.

## COUNT IV

### (§ 1605A(c) CAUSE OF ACTION – FALSE IMPRISONMENT)

57.     Paragraphs 1 through 56 above are incorporated as if set forth herein.

58.     Mr. Zakka was deprived of liberty without cause and without legal justification. Iran held Mr. Zakka despite knowledge that it had no basis to do so.

## **PRAYER FOR RELIEF**

59.     As a result of the personal injuries he has suffered due to acts of torture and

hostage-taking, Mr. Zakka is entitled to economic damages and compensatory damages for pain

and suffering, all of which are recoverable under the FSIA.  28 U.S.C. § 1605A.

60.     In addition to all appropriate compensatory damages, Mr. Zakka is entitled to

punitive damages because Iran's acts were intentional, malicious, and performed deliberately to

injure, damage, and harm Mr. Zakka.

61.     Mr. Zakka further seeks costs, attorneys' fees, and such other relief as may be just

and proper, including pre-judgment interest.

Dated:  September 3, 2021

Respectfully submitted,

*/s/ Emily Grim*
Scott D. Gilbert (D.C. Bar # 290932)
Emily Grim (D.C. Bar # 1006597)
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Tel:  (202) 772-2200
Fax:  (202) 772-3333
gilberts@gilbertlegal.com
grime@gilbertlegal.com

*Attorneys for Plaintiff Nizar Zakka*