**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NIZAR ZAKKA,

      *Plaintiff,*

  v.

GOVERNMENT OF THE ISLAMIC
REPUBLIC OF IRAN,

      *Defendant.*

---

Civil Action No. 1:21-cv-02344 (CJN)

**SEALED MEMORANDUM OPINION**

Nizar Zakka was imprisoned in Evin Prison in Tehran for four years after being invited to speak at a conference by an Iranian official. Following his release, Zakka filed this suit against Iran, relying on the state-sponsored-terrorism exception to the Foreign Sovereign Immunities Act. Iran has failed to appear. For the reasons discussed below, the Court grants Zakka's motion for default judgment.

## I.      Background

### A.  Relevant Findings of Fact

#### 1.      Zakka's Imprisonment

Zakka was born in Lebanon in 1966. ECF 17-2 at 2. He moved to the United States at the age of 15 and eventually founded the Arab Information and Communications Technology Association (known as IJMA3), "an international nonprofit whose work involves encouraging the development of information and communications technology infrastructure around the world." *Id.* at 3. Zakka's role in IJMA3 (and its U.S.-based equivalent, IJMA3-USA) involved speaking at conferences in the Middle East, often as part of grants and subgrants received from the U.S. federal government. *Id.* at 4.

1

One such grant was part of the Women's Alliance for Virtual Exchange (WAVE) program, which "involved a capacity-building project for women-led civil society non-governmental organizations from the Middle East and North Africa, including Iran." *Id.* at 4. In furtherance of the WAVE program, Zakka began traveling to Iran to speak at conferences on various topics. *Id.* at 5. Each of those trips arose from a formal invitation from the Iranian government and "was cleared and paid for by the U.S. Department of State." *Id.* at 6.

On September 18, 2015, Zakka was returning from one such trip after speaking at Tehran's International Conference on the Role of Women in Sustainable Development. *Id.* On his way to the airport, however, Zakka was pulled out of his taxi, blindfolded, and forced into another car. *Id.* at 6–7. He was then imprisoned in a small cell and told that someone had taken his passport and boarded his scheduled flight "so no one would think to look for [him] in Iran." *Id.* at 7. Zakka learned that he had been taken to Evin Prison by the Islamic Revolutionary Guard Corps. *Id.* at 9. Zakka was repeatedly interrogated by captors who attempted to make him confess to being a U.S. spy, including by beating him, forcing him into stress positions for hours at a time, stepping on his fingers, and refusing to feed him. *Id.* at 7–9.

After approximately ten months, Zakka was brought before an Iranian judge. The judge informed Zakka that he would set bail at two billion dollars, which Zakka understood to mean that he "could be released on bail only if the United States paid Iran the money Iran claimed to be owed" in assets frozen by the U.S. government. *Id.* at 12. Shortly thereafter, the judge sentenced Zakka to ten years in prison and imposed a $4,220,000 fine. *Id.* Zakka was taken back to Evin Prison and placed into solitary confinement for several months. *Id.* at 13. He was then moved to a "'public' cell of the prison, which housed political prisoners," where he was held in a room "about five meters by five meters, with triple-decker beds housing 25 people." *Id.* That cell was

"dirty and crawling with cockroaches," and Zakka and the other prisoners "slept on mattresses infested with bedbugs." *Id.* Zakka was kept in that cell for 28 more months, during which he went on five hunger strikes, the longest of which lasted 33 days and required him to be hospitalized. *Id.* at 14.

On June 11, 2019—almost four years since he had been kidnapped and taken to Evin Prison—Zakka's guards took him to a shopping mall in downtown Tehran. *Id.* at 14. They apologized to Zakka, began filming him, and bought him a carpet. *Id.* at 14–15. They then drove Zakka to an airport, where a Lebanese official was waiting with a private plane. *Id.* at 15. Zakka was taken to the U.S. embassy in Beirut, and four days later, he flew back to the United States. *Id.*

### 2.    Post-Release Suffering

Zakka's personal life was devastated by these events: his mother died during his imprisonment; his wife divorced him shortly after his return; and he became estranged from his children. *Id.* at 15. The same is true of his professional life. During his imprisonment, Zakka fell out of step with "the regulatory and technical developments" in his field and lost the professional network that had been "a critical part of [his] career." *Id.* at 15–16. Moreover, the nonprofit Zakka founded "fell apart in [his] absence"; Iran's claims that Zakka was a U.S. spy had made it too risky for the U.S. government or Middle Eastern organizations to partner with IJMA3. *Id.* at 18.

Zakka also remains physically and psychologically damaged from the experience. The beatings he suffered in Evin Prison made him lose almost all hearing in one ear; the low lighting in his cell caused his eyesight to deteriorate; his hunger strikes led to digestive issues that limit him mostly to a liquid diet; and he often "feel[s] weak and ha[s] dizzy spells." *Id.* at 19. Zakka requires medication to sleep and routinely relives "some of the worst and most painful times of [his] imprisonment." *Id.*

### B.  Procedural Background

In September 2021, Zakka filed this action against Iran, relying on 28 U.S.C. § 1605A(c)'s cause of action against state sponsors of terrorism. He seeks money damages for assault and battery, intentional infliction of emotional distress, and false imprisonment. *See* ECF 1 at 10–13. Zakka properly served Iran through diplomatic channels on August 22, 2022. *See* ECF 12; 28 U.S.C. § 1608(a)(4). Iran did not appear or respond to the complaint, and the Clerk of the Court entered default on September 8, 2022. *See* ECF 15. Zakka then moved for entry of default judgment. *See* ECF 18.

## II.    Legal Standards

Courts may enter default judgments against parties who fail to appear before them. Fed. R. Civ. P. 55(b)(2). But the "entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Instead, the Court has the "affirmative obligation" to ensure that it has subject-matter jurisdiction over the action and personal jurisdiction over the defendant. *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 133 (D.D.C. 2021).

Additionally, "[w]hen default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting 28 U.S.C. § 1608(e)). "In a FSIA default proceeding, a court can find that the evidence presented is satisfactory "when the plaintiff shows 'her claim has some factual basis,' . . . even if she might not have prevailed in a contested proceeding." *Sotloff*, 525 F. Supp. 3d at 134 (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)). "[U]ncontroverted factual allegations supported by admissible evidence may be taken as true." *Id.* And in assessing whether to enter default judgment, the Court can rely on a plaintiff's affidavits and declarations. *Owens*, 864 F.3d at 785.

### III.    Analysis

Based on the above findings of fact, the Court makes the following conclusions of law.

### A.  Foreign Sovereign Immunity

Unlike the sovereign immunity of the United States, "foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983).  The immunity of a foreign country therefore is subject to several statutory exceptions.  The relevant exception here is 28 U.S.C. § 1605A, which strips immunity in cases "in which money damages are sought against a foreign state for personal injury or death that was caused by" certain acts of terrorism against certain categories of people.  28 U.S.C. § 1605A(a)(1)–(2).

Zakka must prove four elements to establish that the state-sponsored-terrorism exception applies:  (1) Iran "was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed"; (2) Zakka was acting within the scope of a contract with the U.S. government at the time of Iran's acts; (3) Zakka afforded Iran a reasonable chance to arbitrate his claims; and (4) Zakka seeks damages "for personal injury or death caused by the act of terrorism." *Sotloff*, 525 F. Supp. 3d at 134; 28 U.S.C. § 1605A.  Zakka has proven all four.

First, Iran was a designated state-sponsor of terrorism during the entire period relevant here. The United States first designated Iran as a state-sponsor of terrorism in 1984.  *See Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 175 (D.D.C. 2019).  The United States has continued to do so since, including during the time of Zakka's imprisonment and when he filed this suit. *See State Sponsors of Terrorism*, Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/.

Second, Zakka was performing a contract awarded by the U.S. government and acting within the scope of that contract when Iran kidnapped and tortured him.  *See* 28 U.S.C. §

1605A(a)(1)(ii)(III).    Zakka's organization, IJMA3, received a subgrant from Palladium International, LLC, to further the mission of the WAVE program. *See generally* ECF 18-5. The government approved that subgrant and funded Zakka's September 2015 trip to Iran, and it planned to meet with Zakka following his return to be debriefed on his trip. *See* ECF 17-2 at 6. Moreover, Zakka's kidnapping and torture at the hands of the Revolutionary Guard was "directly related to his contract work with the United States government." *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 133 (D.D.C. 2019). Thus, Zakka's trip to Iran, including the taxi ride to the airport during which he was kidnapped, was in furtherance of and within the scope of Zakka's contracts with the government.

Third, Zakka offered to arbitrate his claims. The FSIA "does not require any particular form of offer to arbitrate, simply the extension of a 'reasonable opportunity.'" *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003). Zakka included with the summons and complaint an "Offer to Arbitrate." *See* ECF 12. That fulfilled Zakka's duty to extend a "reasonable opportunity" to Iran to arbitrate.

Finally, Zakka seeks "damages for personal injury or death caused by the foreign state's commission of at least one terrorist act enumerated in the statute, including 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.'" *Sotloff*, 525 F. Supp. 3d at 135 (quoting 28 U.S.C. § 1605A(a)(1)).

Zakka seeks money damages. *See* 28 U.S.C. § 1605A(c) ("[Money] damages may include economic damages, solatium, pain and suffering, and punitive damages."). He has also clearly demonstrated that he suffered both hostage taking and torture at the hands of Iran. Start with hostage taking, which the FSIA defines by reference to Article 1 of the International Convention against the Taking of Hostages. The Convention states:

> Any person who seizes or detains and threatens to kill, to injure[,] or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages . . . .

28 U.S.C. § 1605A(h)(2); International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 18 I.L.M. 1456, 1316 U.N.T.S. 205.  Hostage taking has two elements:  (1) "abduction or detention" and (2) "the purpose of accomplishing 'the sort of third-party compulsion described in [C]onvention.'"  *Sotloff*, 525 F. Supp. 3d at 135 (alteration in original) (quoting *Simpson*, 470 F.3d at 359).

Zakka has satisfied both elements.  While Zakka was ultimately released without any assurance or agreement from the United States, the $2 billion bail imposed on him by the Iranian judge was likely a reference to the United States' recent seizure of a roughly equivalent amount of money from Iran's central bank.  *See Bank Markazi v. Peterson*, 578 U.S. 212, 215 (2016).  The fine that the Iranian court ultimately imposed on him was calculated based on projects that Zakka had completed for the U.S. government.  ECF 17-2 at 12–13.  These indications that Iran hoped to use Zakka's detention as a tool against the United States—along with Iran's "long and problematic track record in state hostage-taking and arbitrary detention of foreign nationals" "to gain diplomatic, economic, and political leverage" over other nations, ECF 18-10 at 25—suffice to show that Zakka's detention constituted hostage-taking under the Convention.  *See* ECF 20 at 9–10 & n.2 (collecting sources tying Zakka's arrest and eventual release to international relations between the United States and Iran).

Zakka's case is even stronger as to torture.  The FSIA defines "torture" by reference to the Torture Victim Protection Act.  28 U.S.C. § 1605A(h)(7).  Under that statute,

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions),

whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—
    (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
    (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
    (C) the threat of imminent death; or
    (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act of 1991 § 3(b), Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 (note). "To establish torture, [Zakka] must also show that the conduct was sufficiently severe and purposeful." *Sotloff*, 525 F. Supp. 3d at 137; *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002) (identifying two measures of what constitutes torture as (1) "the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim" and (2) the extent to which the "production of pain is purposive").

Iran has a well-documented pattern of using torture "to force prisoners to provide untrue confessions against themselves as well as others." ECF 18-10 at 19. In keeping with that pattern, Iran's officials at Evin Prison beat Zakka, threatened him with death, and subjected him to months of solitary confinement. *See* ECF 17-2 at 10–14. They did so to attempt to get Zakka to admit to being a U.S. spy. *Id.* at 8, 13. Their actions constitute torture under the FSIA, satisfying the final

8

requirement of the state-sponsored-terrorism exception to sovereign immunity.  *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 151–53 (D.D.C. 2017).

### B.  Jurisdiction

The Court has subject-matter and personal jurisdiction over this action.

### 1.    Subject-Matter Jurisdiction

Under 28 U.S.C. § 1330(a), federal district courts have jurisdiction over "[1] any nonjury civil action [2] against a foreign state …  [3] as to any claim for relief in personam [4] with respect to which the foreign state is not entitled to immunity" under 28 U.S.C. §§ 1605–1607.  Zakka meets all four requirements:  although he initially included a jury demand in his complaint, *see* ECF 1-1, he has since withdrawn that demand, *see* ECF 21 at 2;[1] the defendant is Iran, a foreign state; the suit is brought against Iran in its capacity as a legal person, not against property; and, as laid out above, Iran is stripped of immunity by the state-sponsored-terrorism exception in 28 U.S.C. § 1605A.

### 2.    Personal Jurisdiction

To impose judgment on a foreign state under the FSIA, the Court must also have personal jurisdiction.  *Sotloff*, 525 F. Supp. 3d at 140.  28 U.S.C. § 1330(b) grants the Court personal jurisdiction over Iran when:  (1) the Court has subject-matter jurisdiction under the FSIA; and (2) Iran was properly served under the FSIA.  As already explained, both requirements are met here.

### C.  Liability

---

[1] Zakka at least arguably needed consent from Iran to withdraw his jury demand.  *See* Fed. R. Civ. P. 38(b).  Even assuming Zakka's withdrawal was ineffective, however, the Court would not be required to dismiss this case for lack of jurisdiction.  Rather, "[t]he sensible practice" in such a situation "is simply to strike the jury demand," *Houston v. Murmansk Shipping Co.*, 667 F.2d 1151, 1154 (4th Cir. 1982), which the Court hereby does, *see* Fed. R. Civ. P. 39(a)(2).

The FSIA creates a private right of action for victims of state-sponsored terrorism.  28 U.S.C. § 1605A(c).  "The right of action requires a demonstration (1) that the victim suffered an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking . . . ; (2) that the act was committed . . . by the foreign state or its agent; and that the act (3) caused (4) personal injury or death (5) for which the courts of the United States may maintain jurisdiction under this section for money damages."  *Mueller v. Syrian Arab Republic*, 656 F. Supp. 3d 58, 77 (D.D.C. 2023) (cleaned up).  "The third and fourth prongs require [Zakka] to articulate a way to recover through the lens of civil-tort liability."  *Encinas v. Islamic Republic of Iran* (18-cv-2568), ECF 20 at 3 (D.D.C. Feb. 28, 2022).

"Having already concluded that the Court possesses subject-matter jurisdiction, little else is needed to show that [Zakka is] entitled to relief."  *Sotloff*, 525 F. Supp. 3d at 141.  As explained above, the evidence establishes that Zakka was the victim of hostage taking and torture at the hands of Iran and that the Court has jurisdiction.

All that is left is whether he has satisfied the third and fourth elements—which, again, are evaluated through the lens of civil-tort liability.  "The elements of causation and injury in the federal cause of action created by § 1605A require FSIA plaintiffs 'to prove a theory of liability' which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered."  *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 122 (D.D.C. 2012) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010)).  "Based on the Circuit Court's guidance, District Courts in this jurisdiction 'rely on well-established principles of law, such as those found Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions' to outline the boundaries

of these theories of recovery." *Id.* (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)).

Zakka asserts four possible claims for relief: assault, battery, intentional infliction of emotional distress, and false imprisonment. *See* ECF 1 at 10–13.

An assault occurs when a person "(a) 'acts intending to cause a harmful or offensive contact with the person . . . or an imminent apprehension of such a contact, and (b) the [person] is thereby put in such imminent apprehension.'" *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 21). "By their very nature, torture and hostage taking subject the victim to 'imminent apprehension of harmful or offensive contact' at all times while in captivity." *Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 132 (D.D.C. 2019); *see also id.* at 132–33 ("Thus, hostages who are tortured or threatened withst[and] a continuous . . . tortious assault that infects every moment of their captivity." (alteration in original) (quoting *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 48 (D.D.C. 2001))). "Given the facts recounted above," Iran is "plainly liable for assault." *Id.* at 133.

Battery occurs when "(1) 'acts [are] intend[ed] to cause a harmful or offensive contact with [a person] . . . or [cause] an imminent apprehension of such a contact, and (2) a harmful contact with [that person] directly or indirectly results.'" *Stansell*, 217 F. Supp. 3d at 342 (quoting Restatement (Second) of Torts § 13). "'Harmful contact' includes 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Abedini*, 422 F. Supp. 3d at 133 (quoting Restatement (Second) of Torts § 15). "Acts of torture—like those [Zakka] endured— undeniably meet this bar." *Id.* Therefore, this Court "has little difficulty concluding that [Zakka's Iranian captors] repeatedly battered" him. *Id.*

An actor is liable for intentional infliction of emotional distress if "by extreme and outrageous conduct [he] intentionally or recklessly causes severe emotional distress to another." Restatement (Second) of Torts § 46; *Abedini*, 422 F. Supp. 3d at 133. "Torture, by definition, involves 'extreme and outrageous' conduct." *Abedini*, 422 F. Supp. 3d at 133. Zakka certainly suffered severe emotional distress because of his hostage taking and torture. *See* ECF 17-2 at 19. And Iran's actions were intentional, in that they were part of an effort to coerce Zakka into giving a false confession. Therefore, Zakka has demonstrated that Iran can be held liable for intentional infliction of emotional distress.

Finally, false imprisonment occurs when "(a) [an actor] acts intending to confine a person within fixed boundaries, . . . (b) his act directly or indirectly results in such a confinement of the other, and (c) the victim is conscious of the confinement or is harmed by it." *Abedini*, 422 F. Supp. 3d at 133 (alterations adopted) (quoting *Sutherland*, 151 F. Supp. 2d at 49). Iran's imprisonment of Zakka certainly meets this standard.

### D.  Damages

The FSIA expressly allows plaintiffs "to pursue 'economic damages' and those for 'pain and suffering.'" *Id.* at 136 (quoting 28 U.S.C. § 1605A(c)). "To obtain damages for an FSIA claim, 'a plaintiff must prove that the consequences of the defendants' acts were reasonably certain to occur, and [he] must prove the amount of damages by a reasonable estimate.'" *Id.* (alteration in original) (quoting *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 69 (D.D.C. 2015)). It is unquestionable that Iran's actions of hostage-taking and torture were "reasonably certain" to injure Zakka. The Court therefore considers whether Zakka's proposed damages are reasonable estimates.

#### 1.    Compensatory Damages

12

Pain and suffering.    As compensation for his pain and suffering, Zakka requests $13,620,000 in pre-release damages.  "In hostage-taking cases, this district applies a per-diem formula—awarding $10,000 per day of captivity—to compensate for injuries sustained while imprisoned."  *Id.* at 136.  "This case presents no reason to deviate from the accepted approach." *Rezaian*, 422 F. Supp. 3d at 180.  Because Zakka was detained for 1,362 days, the Court awards him the requested amount in pre-release damages.

As for post-release damages, "[a]lthough no [similar] formula exists for calculating [these] damages, awards granted to similarly situated plaintiffs in FSIA lawsuits help guide the Court through this delicate terrain." *Abedini*, 422 F. Supp. 3d at 137.  "Central to determining the amount of these sums are 'the victim's age at the time of release (the length of time he will be experiencing pain and suffering) and the extent of the victim's long-term injuries (the level of pain and suffering).'"  *Id.* (quoting *Hekmati*, 278 F. Supp. 3d at 164).

Zakka seeks $12,000,000 in post-release damages.  However, plaintiffs similarly situated to Zakka have often received $10,000,000 in post-release damages.  For example, the plaintiff in *Hekmati v. Islamic Republic of Iran* was held in Evin Prison and suffered similar torture as Zakka. *See* 278 F. Supp. 3d 145, 150–55.  However, Hekmati was held for 1,604 days—242 days longer than Zakka—and had a life expectancy of over 45 years at the time of his release, as compared to Zakka's life expectancy of 28 years. *See id.* at 164; ECF 17-1 at 34 n.8.  Hekmati received a post-release damages award of $10,000,000, in line with a series of similar detention cases. *See* 278 F. Supp. 3d at 164; *see also, e.g.*, *Rezaian*, 422 F. Supp. 3d at 180 (awarding $10,000,000 to a plaintiff who was tortured in Evin Prison for 544 days and released at the age of 40).  The Court concludes that *Hekmati* and *Rezaian* are comparable analogues and awards Zakka $10,000,000 for post-release pain and suffering damages.

Economic damages.    "Establishing a reasonable estimate of lost earnings through persuasive expert analysis supported by sound factual bases has been deemed sufficient." *Rezaian*, 422 F. Supp. 3d at 181.  Zakka submitted two expert reports as to his lost earnings.  The first report, submitted by an expert in vocational damages, concluded that Zakka's "earnings will likely range from 15-35% of the wages he would have been expected to earn had he not been injured as a result of his incarceration." ECF 17-5 at 23.  It also concluded that Zakka's non-injured earning capacity would have ranged from $168,147 and $259,958, with the latter number being "more reflective of Mr. Zakka's earning capacity in the competitive labor market." *Id.* at 17.  A forensic economist, Dr. Frank Slesnick, then used those two ranges—15% to 35% and $168,147 to $259,958—to calculate four possible economic loss amounts.  *See* ECF 17-6 at 7–8.  Zakka argues that, given the vocational damages expert's opinion that $259,958 is more reflective of Zakka's non-injured earning capacity, the Court should award the midpoint of the two loss amounts that Slesnick calculated using that number.    The Court agrees and concludes that the amount requested, $2,960,009, is the best estimate of the present value of Zakka's lost earnings.

Zakka also seeks $311,102 in damages for ongoing medical treatment.  Based on a psychiatrist's evaluation of Zakka's continuing need for psychotherapeutic support and medication, Slesnick's report concluded that Zakka's injuries would require him to incur medical costs ranging from $248,034 to $374,169.  *Id.* at 11.  The Court concludes that the amount requested by Zakka, again at the midpoint of Slesnick's range, is a reasonable estimate of the present value of Zakka's expected economic damages for medical treatment.

The Court therefore awards Zakka $3,271,111 in economic damages; combined with his non-economic damages of $23,620,000, Zakka's total compensatory award is $26,891,111.

2.    **Punitive Damages**

14

"The final category of damages at issue is punitive damages," which "are awarded not to compensate the victims, but to punish outrageous behavior and deter such outrageous conduct in the future." *Rezaian*, 422 F. Supp. 3d at 183 (citations omitted). "Courts have repeatedly held, in section 1605A cases, that Iran's actions were outrageous, and imposed substantial punitive damages awards as a result." *Id.* And the Court agrees with previous decisions that "[h]olding a man hostage and torturing him to gain leverage in negotiations with the United States is outrageous, deserving of punishment, and surely in need of deterrence." *Id.*

Much harder than the question of *whether* to award punitive damages is the question of *how much*. "To calculate punitive damages awards in section 1605A cases, courts consider (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* (quotations omitted). But "[e]mployment of these factors has yielded several different methods of determining the ultimate award." *Id.* Some courts have multiplied the foreign state's annual expenditures on terrorism by a factor between three and five; others have awarded each affected family a fixed amount of $150,000,000; and others have awarded punitive damages in an amount equal to the total compensatory damages. *See id.* (collecting cases).

Zakka asks for $150,000,000. But in similar cases, the Court repeatedly has found that, for many of the same reasons given in *Abedini*, "the most appropriate method is . . . making punitive damages equal to compensatory damages," 422 F. Supp. 3d at 142; *see Shahini v. Iran* (18-cv-1619), ECF 48 at 24 (D.D.C. Mar. 15, 2023); *White v. Iran* (22-cv-740), ECF 25 at 15–16 (D.D.C. Aug. 6, 2024). Thus, the Court will award Zakka punitive damages equal to his compensatory damage award.

15

### IV.    Conclusion

The Court grants Zakka's motion for default judgment.  A separate order will be issued contemporaneously with this opinion.


DATE:  May 29, 2025

_____
CARL J. NICHOLS
United States District Judge